IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BRIAN HOOLIHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | FILE NO.: 1:10-CV-1753-SCJ |
| CLAYTON COUNTY, GEORGIA, | ) | |
| DAVID S. KENDLE, | ) | |
| MICHAEL W. HOBBS, | ) | |
| JOHN DOE, JANE DOE | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT CLAYTON COUNTY, GEORGIA'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Clayton County, Georgia ("this defendant") and, pursuant to Local Rule 56.1(B)(1), files this Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, showing the Court as follows:

1.

At approximately 10:00 p.m. on February 4, 2009, plaintiff Brian Hoolihan ended his shift at the Cracker Barrel restaurant in McDonough, Georgia, where he was working as an Associate Manager. Hoolihan then began driving in his 2006 Ford Fusion to his home in Stockbridge, Georgia. (Hoolihan Depo., pp. 24-25, 30, 45, 93, 100-01.)

2.

Hoolihan has suffered from Addison's disease, hyperthyroidism, and diabetes for the past 22 years.  (Hoolihan Depo., pp. 72-73, 79-80, 82-83.)

3.

Hoolihan's medical conditions can cause his blood sugar to drop.  (Hoolihan Depo., pp. 82-85.)

4.

At least twice prior to February 5, 2009, Hoolihan had experienced crises with his conditions which caused him to lose consciousness and experience blackouts.  (Hoolihan Depo., pp. 85-86, 88-89.)

5.

Hoolihan is familiar enough with his symptoms to know when he is about to experience a crisis with his condition.  (Hoolihan Depo., pp. 72-73, 79-81.)

6.

Hoolihan did not reach his home after leaving work on February 4, 2009. Instead, he stopped in a parking lot, where he became disoriented and lost consciousness.  (Hoolihan Depo., p. 100.)

7.

Defendant Michael Hobbs is employed as a Police Officer with the Clayton County Police Department ("CCPD").  At approximately 1:45 a.m. on February 5, 2009, Hobbs was on duty and driving his patrol vehicle, accompanied by Officer David Kendle.  At that time, Hobbs observed Hoolihan's vehicle in the parking lot of a fitness center at 7420 Davidson Parkway.  The fitness center parking lot was rarely occupied at that hour, and so Hobbs drove toward the vehicle.  He noticed that it was not parked within the borders of a parking space; instead, it was lodged up against a handicap parking sign.  The sign was partially bent over, apparently due to the force from the vehicle, which was still running.  Hoolihan was slumped sideways over the console.  (Hobbs Decl., pars. 2-3.)

8.

In order to further assess the situation, Hobbs exited his patrol car and attempted to raise Hoolihan's attention by tapping on the driver's side window and loudly calling to him.  Although Hoolihan looked up at one point, his head bobbed. Hobbs asked Hoolihan if he had been drinking, but Hoolihan only mumbled incoherently in response.  (Hobbs Decl., par. 4.)

9.

Because the engine was running, the vehicle was still in "drive," and because Hoolihan was generally unresponsive, Hobbs told Hoolihan to put his car in "park" and to unlock his door.  Hoolihan did not attempt to do so.  (Hobbs Decl., par. 5.)

10.

Based upon his observations, Hobbs suspected that perhaps Hoolihan had been involved in a wreck or was under the influence of alcohol or drugs.  In light of the fact this, Hobbs became concerned that Hoolihan's vehicle posed a significant danger.  Hobbs determined that it was necessary to ensure that the vehicle was placed in "park" and turned off in order to secure the area.  (Hobbs Decl., par. 6.)

11.

Hobbs instructed Kendle to pull the patrol car directly behind Hoolihan's vehicle in order to prevent it from moving.  Kendle did so and parked the patrol vehicle directly behind, but not touching, Hoolihan's vehicle.  (Hobbs Decl., par. 7.)

12.

Hobbs then attempted to gain entry to the vehicle, but he found that all of the doors were locked and the windows were completely up.  As a last resort, Hobbs

used his ASP baton to break out the rear window on the driver's side of the vehicle. Hobbs chose that window because it was the least likely to send glass flying in Hoolihan's direction when it was broken.  (Hobbs Decl., par. 8.)

13.

With the window broken, Hobbs was able to reach inside and unlock the back door on the driver's side of the vehicle.  Once Hobbs opened the door and got inside the car, he attempted to unlock the driver's door. As he did so, Hoolihan turned toward him.  Hoolihan then punched Hobbs and grabbed at his left arm and wrist.  (Hobbs Decl., par. 9.)

14.

Hobbs pulled his left arm from Hoolihan's grasp.  Hoolihan then began punching Hobbs in his shoulder area.   In response, Hobbs gave loud verbal commands for Hoolihan to "stop fighting," but Hoolihan did not comply.   In an attempt to subdue Hoolihan's attack, Hobbs applied one or two closed-fist strikes to Hoolihan's face. (Hobbs Decl., par. 10.)

15.

Hoolihan then shifted his body into the front passenger seat with his back to the passenger-side door and began kicking at Hobbs' head.  Hobbs responded by pinning Hoolihan's feet between the front bucket seats.  When he did so, Hoolihan

continued to grab at Hobbs' hands.  As Hoolihan was grasping Hobbs' left hand, Hobbs was able to get his right hand free and unlock the front door on the passenger side of the vehicle.  (Hobbs Decl., par. 11.)

16.

Kendle, who was positioned directly outside the passenger-side door, immediately opened the door and removed Hoolihan from the vehicle.  At the same time, Hobbs exited the vehicle from the driver's side rear door and ran around the vehicle to assist Kendle, who was struggling with Hoolihan.  (Hobbs Decl., par. 12.)

17.

Kendle had placed Hoolihan on the ground.  Even though Hoolihan was lying on his abdomen and side, he continued to struggle by grabbing at Kendle's hands and wrists.  Kendle and Hobbs continued giving loud verbal commands to Hoolihan, ordering him to stop fighting and to put his hands behind his back. Hoolihan refused to comply with these commands and continued to fight and resist.  (Hobbs Decl., par. 13.)

18.

Kendle was sitting on the back of Hoolihan's legs and attempting to handcuff Hoolihan when the vehicle rolled backward and the open passenger door pinned Kendle to Hoolihan's back.  (Hobbs Decl., par. 14.)

19.

Hobbs knelt down beside Kendle and Hoolihan in order to help Kendle secure Hoolihan in handcuffs.  Hoolihan grabbed Hobbs' left arm, twisted it, and tried to pull it under his torso.  In order to gain control of the situation, Hobbs delivered an elbow strike to Hoolihan's head.  Hoolihan then allowed himself to be handcuffed, and there was no further struggle.  (Hobbs Decl., par. 15.)

20.

As soon as Hoolihan was secured in handcuffs, Hobbs called for emergency medical help.  (Hobbs Decl., par. 16.)

21.

Hobbs did not see a necklace, bracelet, or other item on Hoolihan's person which contained any information regarding the nature of Hoolihan's medical condition until after the struggle was over.  (Hobbs Decl., par. 18.)

22.

When he first purchased the Ford Fusion, Hoolihan had placed a "Medic Alert" decal on the window of the driver's door.  (Hoolihan Depo., p. 94.)  The decal had been displayed on another car in 2004 or 2005 before Hoolihan purchased the Ford Fusion, and Hoolihan had moved the decal to his new vehicle. (Hoolihan Depo., p. 97.)

23.

At one time, the decal depicted a logo with a snake wrapped around a cross and the words "Medic Alert" printed in red.  (Hoolihan Depo., pp. 94, 98-99, 162-63; see also, http://www.medicalert.org/.)

24.

On the date of this incident, however, Hobbs did not see a sticker or a decal on Hoolihan's vehicle.  (Hobbs Decl., par. 17.)

25.

The decal has faded consistently over the years.  (Hoolihan Depo., pp. 98, 163.)  Today, only an empty black football-shaped outline of the logo still appears. (Hoolihan Depo., pp. 98-99; compare http://www.medicalert.org/.)   Although Hoolihan claims that the words on the decal were legible (at least to some degree)

on the date of the incident, the decal had faded to the point that Hoolihan himself had been unable to see the writing on it since 2010.  (Hoolihan Depo., pp. 99-100.)

26.

The faded decal which was on the driver's window is the <u>only</u> item which Hoolihan has placed on his car to alert others of his medical condition.  (Hoolihan Depo., p. 100.)  Even though Hoolihan has received new decals over the past few years, he has not replaced the faded decal because of the pendency of this lawsuit. (Hoolihan Depo., p. 98.)

27.

Plaintiff has failed to adduce evidence to support the allegations in his complaint which state that he "wears a diabetic bracelet" and that, after his arrest, "it was quickly determined by Plaintiff's diabetes alert bracelet that same was suffering from extremely low blood sugar."  (First Amended Complaint, Doc. 31, pars. 12, 15.)  To the contrary, Hoolihan was wearing a "Medic Alert" <u>necklace</u>, but not a bracelet, on the date of the incident.  (Hoolihan Depo., pp. 94-95.)

28.

Hoolihan wears a button-down dress shirt with a tie when he works at the Cracker Barrel.  (Hoolihan Depo., p. 113.)  Underneath his dress shirt, he wears a tee shirt and the "Medic Alert" necklace.  (Hoolihan Depo., p. 113.)

29.

On his belt, Hoolihan wears an insulin pump on his belt which is approximately two inches wide, about three to four inches tall, and three quarters of an inch thick.  (Hoolihan Depo., pp. 111-12.)

30.

At no time during the incident did Hoolihan inform the officers that he was a diabetic, or that he required any accommodation for a medical condition.  (Hobbs Decl., par. 19.)

31.

Plaintiff has adduced no evidence to support his allegation that either Kendle or Hobbs made calls with his cell phone after the arrest.   (First Amended Complaint, Doc. 31, pars. 16-20.)  Elizabeth Langan, a friend of plaintiff's who lives in Maryland, received a telephone call from plaintiff's cell phone at approximately 2:00 a.m.  (Langan Depo., p. 17.)  According to Langan, the caller identified himself as a police officer and told her his name, but she does not recall the name given by the caller.  (Langan Depo., pp. 18, 37.)  The officer asked Langan for the names of any family members of plaintiff whom he could notify of plaintiff's condition.  (Langan Depo., pp. 19-20.)

32.

Hoolihan was cited for two counts of simple battery against a law enforcement officer and two counts of obstructing an officer.  When the citations were issued, Hobbs believed that Hoolihan had willfully committed these offenses. Hobbs had no knowledge regarding Hoolihan's medical condition and did not know what had caused him to behave in the manner he did.  (Hobbs Decl., par. 20.)

33.

Hoolihan has no recollection of his encounter with Hobbs and Kendle. (Hoolihan Depo., pp. 100-01.)  Thus, he cannot dispute Hobbs' account that he was combative when Hobbs entered the vehicle.  (Hoolihan Depo., p. 151-52.)

34.

Hoolihan has not sought or received treatment for emotional distress since the incident.  (Hoolihan Depo., pp. 19-21, 145.)

35.

Before February 5, 2009, Hobbs had received significant basic mandate training as well as training from the Clayton County Police Department regarding use of force.  (Hobbs Decl., par. 21.)

36.

Throughout his employment with the Clayton County Police Department, Hobbs has been certified by the Georgia Peace Officers Standards and Training ("POST") and has satisfied all the training requirements required by law.  (Hobbs Decl., par. 22.)

37.

In order to become a POST certified peace officer, Hobbs attended a 16-week training class, and as part of that course, took several hours of instruction on proper use of force when effectuating an arrest.  (Hobbs Decl., par. 23.)

38.

The Clayton County Police Department requires that officers receive additional in-house training on various aspects of use of force.  Hobbs has attended the required in-service training.  (Hobbs Decl., par. 24.)

39.

As part of his training with the police department, Hobbs was issued a policy and procedures manual, which contains a section on the proper use of force. (Hobbs Decl., par. 25.)

40.

During his training, Hobbs was taught that it was the policy of the Clayton County Police Department to only use the minimum amount of force necessary to overcome resistance or a threat and to cease the use of force once the resistance or threat had subsided.   (Hobbs Decl., par. 26.)

41.

At all times relevant to this action, Hobbs was acting in good faith and without fraud, malice, or corruption.  (Hobbs Decl., par. 28.)

42.

At all times relevant to plaintiff's allegations, Hobbs was acting within the scope of his official duties and employment as an officer of the Clayton County Police Department.  (Hobbs Decl., pars. 2, 27.)

43.

The Clayton County Police Department maintains written a policy regarding the use of force.  Departmental policies are reviewed, evaluated and amended from time to time.  (Porter Decl., par. 3.)

44.

As the policy existed on February 5, 2009, and as it exists today, an officer should use the least amount of force perceived to be reasonably necessary under

the circumstances to safely control a situation.  Officers are, however, permitted to use whatever force is reasonable and necessary to protect themselves or others from bodily harm.  Necessary force is defined as the minimum amount of force which is required to achieve a legitimate police objective.  (Porter Decl., par. 4.)

45.

The Clayton County Police Department policy in effect on February 5, 2009 did not allow officers to use more force than necessary to subdue an arrestee. (Porter Decl., par. 5.)

46.

All officers employed by the Clayton County Police Department are required to undergo training and obtain certification from the Georgia Peace Officers Standards and Training Council.  Such training includes the proper use of force.  The use of force, including deadly force, is also discussed frequently during in-service training classes and meetings.  (Porter Decl., par. 6.)

47.

Each year, officers are re-trained in the proper use of force when they re-qualify to carry their firearms.  (Porter Decl., par. 7.)

48.

Although all officers are trained in the general principles relevant to the use of force, they are expected to use their discretion when deciding precisely how much force to apply in the course of an arrest. (Porter Decl., par. 8.)

49.

Officers are further trained and instructed by their supervisors to make reasonable accommodations to persons with disabilities. In order to do so, however, an officer who encounters a person who appears to be in an altered state of consciousness -- whether this is caused by intoxication, a psychological disorder, or a medical condition -- must first secure the area for the safety of all persons involved at the scene. (Porter Decl., par. 9.)

50.

The Clayton County Police Department enforces its policies through the chain of command and through internal departmental investigations. (Porter Decl., par. 10.)

51.

This incident was investigated by the Internal Affairs Unit of the Clayton County Police Department, which found no violations of policy or law by the officers involved. (Porter Decl., par. 11.)

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**


*/s/ Brian R. Dempsey*
Jack R. Hancock
Georgia Bar No. 322450
jhancock@fmglaw.com
Brian R. Dempsey
Georgia Bar No. 217596
bdempsey@fmglaw.com

661 Forest Parkway
Suite E
Forest Park, Georgia 30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)


Attorneys for Defendant Clayton County

L:\DOCS\3000\00379\00045728.DOC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT CLAYTON COUNTY, GEORGIA'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Stacy Dane Barnett, Esq.
The Barnett Law Firm
181 East Main Street
Canton, Georgia 30114
Barnettlawfirm@gmail.com

Marc Avidano, Esq.
Smith Welch Webb & White, LLC
2200 Keys Ferry Court
McDonough, Georgia 30253
mavidano@smithwelchlaw.com

Andrew Gebhardt, Esq.
Smith Welch Webb & White, LLC
280 Country Club Drive, Suite 200
Stockbridge, Georgia 30281
agebhardt@smithwelchlaw.com

Rory K. Starkey, Esq.
The Starkey Law Firm, LLC
44 Broad Street, Suite 711
Atlanta, Georgia 30303
rkstarkey@ureach.com

This 18th day of August, 2011.

                                    **FREEMAN MATHIS & GARY, LLP**


                                    */s/ Brian R. Dempsey*
                                    Brian R. Dempsey
                                    Georgia Bar No. 217596
                                    bdempsey@fmglaw.com

661 Forest Parkway
Suite E
Forest Park, Georgia 30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)