IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRIAN HOOLIHAN,               )
                              )
    Plaintiff,               )
                              )
v.                            )        CIVIL ACTION
                              )        FILE NO.: 1:10-CV-1753-SCJ
CLAYTON COUNTY, GEORGIA,      )
DAVID S. KENDLE,              )
MICHAEL W. HOBBS,             )
JOHN DOE, JANE DOE            )
                              )
    Defendants.              )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CLAYTON COUNTY, GEORGIA'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Clayton County, Georgia ("the County") and files this memorandum of law in support of its motion for summary judgment, showing the Court as follows:

## I.    INTRODUCTION

In this Section 1983 action, plaintiff Brian Hoolihan claims that two Clayton County police officers arrested him without probable cause and subjected him to excessive force on February 5, 2009.

At approximately 10:00 p.m. on February 4, 2009, plaintiff Brian Hoolihan ended his shift at the Cracker Barrel restaurant in McDonough, Georgia, where he was working as an Associate Manager.  Hoolihan then began driving in his 2006 Ford Fusion to his home in Stockbridge, Georgia.  (Hoolihan Depo., pp. 24-25, 30, 45, 93, 100-01.)

Hoolihan has suffered from Addison's disease, hyperthyroidism, and diabetes for the past 22 years.  (Hoolihan Depo., pp. 72-73, 79-80, 82-83.)  These conditions can cause his blood sugar to drop.  (Hoolihan Depo., pp. 82-85.)  Indeed, at least twice prior to February 5, 2009, Hoolihan had experienced crises with his conditions which caused him to lose consciousness and experience blackouts.  (Hoolihan Depo., pp. 85-86, 88-89.)  Hoolihan is familiar enough with his symptoms to know when he is about to experience a crisis with his condition. (Hoolihan Depo., pp. 72-73, 79-81.)

Hoolihan did not reach his home after leaving work on February 4, 2009. Instead, he stopped in a parking lot, where he became disoriented and lost consciousness.  (Hoolihan Depo., p. 100.)  Later that night, he was encountered by defendant Michael Hobbs, who is a police officer with the Clayton County Police Department ("CCPD").  At approximately 1:45 a.m. on February 5, 2009, Hobbs was on duty and driving his patrol vehicle, accompanied by Officer David Kendle.

At that time, Hobbs observed Hoolihan's vehicle in the parking lot of a fitness center at 7420 Davidson Parkway.   The fitness center parking lot was rarely occupied at that hour, and so Hobbs drove toward the vehicle.  He noticed that it was not parked within the borders of a parking space; instead, it was lodged up against a handicap parking sign.  The sign was partially bent over, apparently due to the force from the vehicle, which was still running.  Hoolihan was slumped sideways over the console.  (Hobbs Decl., pars. 2-3.)

In order to further assess the situation, Hobbs exited his patrol car and attempted to raise Hoolihan's attention by tapping on the driver's side window and loudly calling to him.  Although Hoolihan looked up at one point, his head bobbed. Hobbs asked Hoolihan if he had been drinking, but Hoolihan only mumbled incoherently in response.  (Hobbs Decl., par. 4.)

Because the engine was running, the vehicle was still in "drive," and because Hoolihan was generally unresponsive, Hobbs told Hoolihan to put his car in "park" and to unlock his door.  Hoolihan did not attempt to do so.   (Hobbs Decl., par. 5.)

Based upon his observations, Hobbs suspected that perhaps Hoolihan had been involved in a wreck or was under the influence of alcohol or drugs.  In light of this, Hobbs became concerned that Hoolihan's vehicle posed a significant

danger.  Hobbs determined that it was necessary to ensure that the vehicle was placed in "park" and turned off in order to secure the area.  (Hobbs Decl., par. 6.)

Hobbs instructed Kendle to pull the patrol car directly behind Hoolihan's vehicle in order to prevent it from moving.  Kendle did so and parked the patrol vehicle directly behind, but not touching, Hoolihan's vehicle.  (Hobbs Decl., par. 7.)  Then, Hobbs attempted to gain entry to the vehicle, but he found that all of the doors were locked and the windows were completely up.  As a last resort, Hobbs used his ASP baton to break out the rear window on the driver's side of the vehicle.  Hobbs chose that window because it was the least likely to send glass flying in Hoolihan's direction when it was broken.  (Hobbs Decl., par. 8.)

With the window broken, Hobbs was able to reach inside and unlock the back door on the driver's side of the vehicle.  Once Hobbs opened the door and got inside the car, he attempted to unlock the driver's door. As he did so, Hoolihan turned toward him.  Hoolihan then punched Hobbs and grabbed at his left arm and wrist.  (Hobbs Decl., par. 9.)  When Hobbs pulled his left arm from Hoolihan's grasp, Hoolihan began punching Hobbs in his shoulder area.  In response, Hobbs gave loud verbal commands for Hoolihan to "stop fighting," but Hoolihan did not comply.  In an attempt to subdue Hoolihan's attack, Hobbs applied one or two closed-fist strikes to Hoolihan's face.  (Hobbs Decl., par. 10.)

Hoolihan then shifted his body into the front passenger seat with his back to the passenger-side door and began kicking at Hobbs' head.  Hobbs responded by pinning Hoolihan's feet between the front bucket seats.  When he did so, Hoolihan continued to grab at Hobbs' hands.  As Hoolihan was grasping Hobbs' left hand, Hobbs was able to get his right hand free and unlock the front door on the passenger side of the vehicle.  (Hobbs Decl., par. 11.)

Kendle, who was positioned directly outside the passenger-side door, immediately opened the door and removed Hoolihan from the vehicle.  At the same time, Hobbs exited the vehicle from the driver's side rear door and ran around the vehicle to assist Kendle, who was struggling with Hoolihan.  (Hobbs Decl., par. 12.)

Kendle had placed Hoolihan on the ground.  Even though Hoolihan was lying on his abdomen and side, he continued to struggle by grabbing at Kendle's hands and wrists.  Kendle and Hobbs continued giving loud verbal commands to Hoolihan, ordering him to stop fighting and to put his hands behind his back. Hoolihan refused to comply with these commands and continued to fight and resist.  (Hobbs Decl., par. 13.)

Further compounding matters, Kendle was sitting on the back of Hoolihan's legs and attempting to handcuff Hoolihan when the vehicle rolled backward and

the open passenger door pinned Kendle to Hoolihan's back. (Hobbs Decl., par. 14.) Hobbs knelt down beside Kendle and Hoolihan in order to help Kendle secure Hoolihan in handcuffs, but Hoolihan grabbed Hobbs' left arm, twisted it, and tried to pull it under his torso. In order to gain control of the situation, Hobbs delivered an elbow strike to Hoolihan's head. Only then did Hoolihan allow himself to be handcuffed. (Hobbs Decl., par. 15.) As soon as the struggle was over, Hobbs called for emergency medical help. (Hobbs Decl., par. 16.)

Until the incident was over, Hobbs did not see a necklace, bracelet, or other item on Hoolihan's person which contained any information regarding the nature of his medical conditions. (Hobbs Decl., par. 18.) Furthermore, Hobbs saw no medical sticker or a decal on Hoolihan's vehicle. (Hobbs Decl., par. 17.) At no time during the incident did Hoolihan inform the officers that he was a diabetic, or that he required any accommodation for a medical condition. (Hobbs Decl., par. 19.)

When he first purchased the Ford Fusion, Hoolihan had placed a "Medic Alert" decal on the window of the driver's door. (Hoolihan Depo., p. 94.) The decal had been displayed on another car in 2004 or 2005 before Hoolihan purchased the Ford Fusion, and Hoolihan had moved the decal to his new vehicle. (Hoolihan Depo., p. 97.) At one time, the decal depicted a logo with a snake

wrapped around a cross and the words "Medic Alert" printed in red.  (Hoolihan Depo., pp. 94, 98-99, 162-63; see also, http://www.medicalert.org/.)  Predictably, however, the decal had faded consistently over the years.  (Hoolihan Depo., pp. 98, 162-63.)  Today, only an empty black football-shaped outline of the logo still appears.   (Hoolihan Depo., pp. 98-99; compare http://www.medicalert.org/.)  Although Hoolihan claims that the words on the decal were legible (at least to some degree) on the date of the incident, the decal had faded to the point that Hoolihan himself had been unable to see the writing on it since 2010.  (Hoolihan Depo., pp. 99-100.)  This faded decal which was on the driver's window is the only item which Hoolihan has placed on his car to alert others of his medical condition.[1]  (Hoolihan Depo., p. 100.)  Even though Hoolihan has received new decals over the past few years, he has not replaced the faded decal because of the pendency of this lawsuit.  (Hoolihan Depo., p. 98.)

Plaintiff has failed to adduce evidence to support the allegations in his complaint which state that he "wears a diabetic bracelet" and that, after his arrest, "it was quickly determined by Plaintiff's diabetes alert bracelet that same was suffering from extremely low blood sugar."  (First Amended Complaint, Doc. 31, pars. 12, 15.)  To the contrary, Hoolihan was wearing a "Medic Alert" necklace,

---

[1]  Hoolihan's complaint incorrectly states that the car is "adorned with diabetic stickers in the rear window."  (First Amended Complaint, Doc. 31, par. 12.)

but not a bracelet, on the date of the incident. (Hoolihan Depo., pp. 94-95.) Hoolihan wears a button-down dress shirt with a tie when he works at the Cracker Barrel. (Hoolihan Depo., p. 113.) Underneath his dress shirt, he wears a tee shirt and the "Medic Alert" necklace. (Hoolihan Depo., p. 113.) On his belt, Hoolihan wears an insulin pump, but it is only about two inches wide, about three to four inches tall, and three quarters of an inch thick. (Hoolihan Depo., pp. 111-12.)

Although plaintiff has alleged that either Kendle or Hobbs made calls with his cell phone after the arrest, he has adduced no evidence of this. (First Amended Complaint, Doc. 31, pars. 16-20.) Elizabeth Langan, a friend of plaintiff's who lives in Maryland, received a telephone call from plaintiff's cell phone at approximately 2:00 a.m. (Langan Depo., p. 17.) According to Langan, the caller identified himself as a police officer and told her his name, but she does not recall the name given by the caller. (Langan Depo., pp. 18, 37.) The officer asked Langan for the names of any family members of plaintiff whom he could notify of plaintiff's condition. (Langan Depo., pp. 19-20.)

After the incident, Hoolihan was cited for two counts of simple battery against a law enforcement officer and two counts of obstructing an officer. When the citations were issued, Hobbs believed that Hoolihan had willfully committed these offenses. Hobbs had no knowledge regarding Hoolihan's medical condition

and did not know what had caused him to behave in the manner he did.  (Hobbs Decl., par. 20.)

Hoolihan, on the other hand, has no recollection of his encounter with Hobbs and Kendle.  (Hoolihan Depo., pp. 100-01.)  Thus, he cannot dispute Hobbs' account that he was combative when Hobbs entered the vehicle.  (Hoolihan Depo., p. 151-52.)

Before February 5, 2009, Hobbs had received significant basic mandate training as well as training from the Clayton County Police Department regarding use of force.  (Hobbs Decl., par. 21.)  Throughout his employment with the Clayton County Police Department, Hobbs has been certified by the Georgia Peace Officers Standards and Training ("POST") and has satisfied all the training requirements required by law.  (Hobbs Decl., par. 22.)  In order to become a POST certified peace officer, Hobbs attended a 16-week training class, and as part of that course, took several hours of instruction on proper use of force when effectuating an arrest.  (Hobbs Decl., par. 23.)

The Clayton County Police Department requires that officers receive additional in-house training on various aspects of use of force.  Hobbs has attended the required in-service training.  (Hobbs Decl., par. 24.)  As part of his training with the police department, Hobbs was issued a policy and procedures manual,

which contains a section on the proper use of force.    (Hobbs Decl., par. 25.)
During his training, Hobbs was taught that it was the policy of the Clayton County
Police Department to only use the minimum amount of force necessary to
overcome resistance or a threat and to cease the use of force once the resistance or
threat had subsided.    (Hobbs Decl., par. 26.)   The Clayton County Police
Department maintains written a policy regarding the use of force, which provides
that an officer should use the least amount of force perceived to be reasonably
necessary under the circumstances to safely control a situation.   Officers are,
however, permitted to use whatever force is reasonable and necessary to protect
themselves or others from bodily harm.   Necessary force is defined as the
minimum amount of force which is required to achieve a legitimate police
objective.   (Porter Decl., pars. 3-4.)   Plainly, the Clayton County Police
Department policy in effect on February 5, 2009 did not allow officers to use more
force than necessary to subdue an arrestee. (Porter Decl., par. 5.)

All officers employed by the Clayton County Police Department are
required to undergo training and obtain certification from POST.  Such training
includes the proper use of force.  The use of force, including deadly force, is also
discussed frequently during in-service training classes and meetings. (Porter Decl.,
par. 6.)  Each year officers are re-trained in the proper use of force when they re-

qualify to carry their firearms.  (Porter Decl., par. 7.)  Officers are further trained and instructed by their supervisors to make reasonable accommodations to persons with disabilities.  In order to do so, however, an officer who encounters a person who appears to be in an altered state of consciousness -- whether this is caused by intoxication, a psychological disorder, or a medical condition -- must first secure the area for the safety of all persons involved at the scene.  (Porter Decl., par. 9.) The Clayton County Police Department enforces all of these policies through the chain of command and through internal departmental investigations.  (Porter Decl., par. 10.)

Based upon the incident described above, Hoolihan has brought federal claims against Clayton County under both Section 1983 and the Americans with Disabilities Act ("ADA").  For the reasons which follow, plaintiff's claims against the County are without merit.[2]

---

[2]  With regard to the constitutionality of the officers' actions, the County adopts the memorandum of law submitted in support of co-defendant Michael Hobbs' Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 10.

## II.        ARGUMENT AND CITATION OF AUTHORITY

Summary judgment is warranted under Fed. R. Civ. P. 56(c) when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v Catrett, 477 U.S. 317, 322 (1986). Once such showing is made, the burden of production shifts to plaintiff, who must adduce "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### A.    Fourth Amendment Claim – Monell Liability

Hoolihan claims that Hobbs and Kendle violated his Fourth Amendment rights by arresting him without probable cause and by using excessive force during the course of his arrest. (First Amd. Compl., par. 22.) The County, however, cannot be held liable for the alleged actions of Hobbs and Kendle based upon a respondeat superior theory of liability. Rather, a local government may be held liable under Section 1983 only when a constitutional violation was inflicted pursuant to the government's policy or custom. Monell v. New York City Dept. Of Social Services, 436 U.S. 658, 694 (1978). To establish such a claim against the County, plaintiff must allege and prove that a policy of the County existed which

was the "moving force" behind the constitutional violation which plaintiff suffered. Monell, 436 U.S. at 694.

In this regard, plaintiff's own allegations against Kendle and Hobbs undercut his Monell claim against the County, in that plaintiff claims that the allegedly excessive force applied by Kendle and Hobbs was "in violation of the standards promulgated by the Clayton County Police Department." (First Amd. Compl., par. 23 (emphasis added).) At the same time, plaintiff generally alleges, based upon "information and belief," that the County's unwritten policies and customs caused a violation of his constitutional rights. (First Amd. Compl., pars. 30-32, 34.) Plaintiff has adduced no evidence, however, to support his speculative allegations regarding unwritten policies and customs.

As a threshold matter, plaintiff cannot maintain a Section 1983 claim against the County because he has failed to establish an underlying violation of his constitutional rights. Gish v. Thomas, 516 F.3d 952, 955 (11th Cir. 2008). Moreover, even if a violation of plaintiff's constitutional rights occurred, which defendants deny, plaintiff has not and cannot show that a policy or custom of the County was the "moving force" behind the violation.

"[T]he requirement of a municipal policy or custom constitutes an essential element of a § 1983 claim that a **plaintiff must prove** in order to establish

13

municipal liability." Buckner v. Toro, 116 F.3d 450, 453 (11th Cir. 1997) (emphasis added). On this motion for summary judgment, plaintiff has the burden of producing issuable facts. Riley v. Newton, 94 F.3d 632, 639 (11th Cir. 1996). The mere "existence of an official policy is insufficient to impose liability on the county." Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1213 (11th Cir. 1993). Rather, a county may be held liable under Section 1983 only when an official county policy was the "moving force of the constitutional violation." Id. Plaintiff does not meet his burden simply by "point[ing] to something the [county] 'could have done' to prevent the unfortunate incident." City of Canton v. Harris, 489 U.S. 378, 392 (1989).

In limited circumstances, a local government's "failure to train" its officers can give rise to a cause of action, but only if the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." See City of Canton, 489 U.S. at 388. An isolated incident cannot give rise to an actionable Section 1983 claim predicated on "deliberate indifference" for failure to adequately train police officers unless there is independent evidence that the moving force behind the constitutional violation was a municipal policy or custom. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985); Vineyard, 990 F.2d at 1212. This is an "intentionally onerous" standard of proof for a plaintiff,

and "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir. 1998). No such evidence exists here. To the contrary, the County's police officers are extensively trained and the police department enforces compliance with its departmental policies. (Hobbs Decl., pars. 21-26; Porter Decl., pars. 3-10.)

In sum, plaintiff has not and cannot adduce evidence that a County policy caused him to suffer a violation of his constitutional rights. As a result, judgment must be entered in favor of the County on plaintiff's Section 1983 claim.[3]

## B.    Americans With Disabilities Act

Plaintiff claims that Clayton County violated the ADA because he was "excluded from participation and/or denied the benefits of the services, programs, or activities" of the County, and that plaintiff otherwise suffered discrimination by

---

[3] Plaintiff seeks punitive damages in his complaint. But county governments, like all local governments, are immune from punitive damages under Section 1983. Newport v. Fact Concerts, 453 U.S. 247, 271 (1981) ("[W]e find that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials. Because absolute immunity from such damages obtained at common law … and because that immunity is compatible with both the purposes of § 1983 and general principles of public policy, we hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983.").

reason of his diabetic condition.   (First Amd. Compl., pars. 41-43.)   These allegations are without merit.

Title II of the ADA prohibits a "public entity" from discriminating against "a qualified individual with a disability" on account of the individual's disability, as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Title II defines a "qualified individual with a disability" as

> [A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).  It also defines a "public entity" as including "any state or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government."   42 U.S.C. §§ 12131(1)(A); 12131(1)(B).  Regulations promulgated by the Department of Justice state that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate

that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

In order to maintain a claim under Title II of the ADA, a plaintiff must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.  Bircoll v. Miami-Dade County, 480 F.3d 1072, 1083 (11th Cir. 2007).  A plaintiff can proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations.  Rylee v. Chapman, 316 Fed. Appx. 901, 906 (11th Cir. 2009).  In cases alleging a failure to make reasonable accommodations, a public entity's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a "specific demand" for an accommodation.  Id.

For purposes of this motion, the County assumes that plaintiff's medical conditions qualify as a disability because plaintiff required daily treatment and he had a history of serious episodes.  But otherwise, plaintiff's ADA claim fails because he has adduced no evidence that he was denied the benefits of the services, programs, or activities of the County, that he suffered discrimination because of his

medical condition, or that he was denied a particular accommodation which he demanded.

Plaintiff has not attempted to show that the officers intentionally discriminated against him because of his medical condition. Nor has he adduced evidence of disparate treatment. Therefore, plaintiff's claim must be based upon the theory that the County did not make reasonable accommodations for him. Such a theory fails at the outset, however, because plaintiff never requested that any accommodation be made for him. (Hobbs Decl., par. 19.); Rylee, 316 Fed. Appx. at 906.

Even with the benefit of hindsight, it is not clear what plaintiff contends the officers should have done differently. The officers were confronted with a genuine emergency when they encountered Hoolihan in an unresponsive condition, and in the driver's seat of a running vehicle which was still in gear and lodged precariously against a signpost. Plaintiff's violent reaction upon Hobbs' entry into the vehicle only compounded the difficulty of the situation. In light of all of this, it is unrealistic to expect the officers would be able to diagnose plaintiff's condition, let alone determine what procedural modifications would be reasonable under the rapidly-changing circumstances.

In recognition of the exigencies involved in the arrest context, some courts have concluded that the ADA does not even apply to "an officer's on-the-street responses to reported disturbances or other similar incidents, whether or nor those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000) (reasoning that requiring "officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents."). In response to this concern, the Eleventh Circuit has stated:

> In our view, the question is not so much one of the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of [the plaintiff's] disability.  The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance.
>
> In other words, **the question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety.**

Bircoll, 480 F.3d at 1085 (emphasis added).  The court went on to explain that the reasonable-modification inquiry in ADA cases is a highly fact-specific inquiry and what is reasonable must be decided on a case-by-case basis.  Id. at 1085-86.

Bircoll involved a man who was "profoundly deaf" and was arrested for driving under the influence.  Id. at 1075, 1078.   Plaintiff alleged that law enforcement officers violated Title II of the ADA because they failed to reasonably modify their procedures in order to ensure effective communication with him.  Id. at 1075.  The court, however, concluded that "waiting for an oral interpreter before taking field sobriety tests is not a reasonable modification of police procedures given the exigent circumstances of a DUI stop on the side of a highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity."  Id. at 1086.

The reasonableness of modifications "must be viewed relative to the particular circumstances of being police officers out in the field, where police must physically arrest suspects, secure the scene, and ensure no threat to anyone's safety, as compared with the less exigent circumstances at a police station."  Sutherland v. Bradshaw, 09-80872-CIV, 2010 WL 989226 (S.D. Fla. Mar. 16, 2010) aff'd sub nom. Sutherland v. Allison, 416 Fed. Appx. 45 (11th Cir. Feb. 9, 2011).  Here, the defendant officers were in no position to develop and implement reasonable accommodations for plaintiff until the scene was secured.  Moreover, as a matter of reasonableness, the ADA does not require officers to use "less than reasonable force in defending themselves and others."  Hainze, 207 F.3d at 801-02.  Rather,

when "officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns."  Tucker v. Tennessee, 539 F.3d 526, 532 (6th Cir.2008).

Clayton County police officers are trained to make reasonable accommodations to persons with disabilities.  (Porter Decl., par. 9.)  In order to do so, however, an officer who encounters a person who appears to be in an altered state of consciousness -- whether this is caused by intoxication, a psychological disorder, or a medical condition -- must first secure the area for the safety of all persons involved at the scene.  (Id.)  This is consistent with the requirements of the ADA.  Accordingly, the County is entitled to judgment in its favor on plaintiff's ADA claim.

## C.    No State Law Claims Against the County

Plaintiff's state law claims are brought only against the officers in their individual capacities, and not against the County.  Indeed, any such claims against the County are barred by sovereign immunity.  Gilbert v. Richardson, 264 Ga. 744, 747, 452 S.E.2d 476, 479 (1994).  See also, O.C.G.A. § 36-1-4 ("A county is not liable to suit for any cause of action unless made so by statute.").

**D.     Claims Against "John Doe" Defendants**

Although Hoolihan names fictional defendants as defendants in his complaint, there are no factual allegations which correspond to them.  In any event, plaintiff's "John Doe" claims must be dismissed because "fictitious party practice is not permitted in federal court." New v. Sports & Rec., 114 F.3d 1092, 1094 n. 1 (11th Cir. 1997).

### III.     CONCLUSION

For the foregoing reasons, plaintiff has failed to establish a claim against the County under either Section 1983 or the ADA.  As a result, the County is entitled to judgment in its favor as a matter of law.

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**

*/s/ Brian R. Dempsey*
Jack R. Hancock
Georgia Bar No. 322450
jhancock@fmglaw.com
Brian R. Dempsey
Georgia Bar No. 217596
bdempsey@fmglaw.com

661 Forest Parkway
Suite E
Forest Park, Georgia 30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)

Attorneys for Defendant Clayton County

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), the undersigned counsel hereby certifies that the foregoing memorandum of law was prepared in Times New Roman 14-point font, in compliance with Local Rule 5.1(C).

This 18th day of August, 2011.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Brian R. Dempsey*
Brian R. Dempsey
Georgia Bar No. 217596
bdempsey@fmglaw.com

661 Forest Parkway
Suite E
Forest Park, Georgia 30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CLAYTON COUNTY, GEORGIA'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Stacy Dane Barnett, Esq.
The Barnett Law Firm
181 East Main Street
Canton, Georgia 30114
Barnettlawfirm@gmail.com

Marc Avidano, Esq.
Smith Welch Webb & White, LLC
2200 Keys Ferry Court
McDonough, Georgia 30253
mavidano@smithwelchlaw.com

Andrew Gebhardt, Esq.
Smith Welch Webb & White, LLC
280 Country Club Drive, Suite 200
Stockbridge, Georgia 30281
agebhardt@smithwelchlaw.com

Rory K. Starkey. Esq.
The Starkey Law Firm, LLC
44 Broad Street, Suite 711
Atlanta, Georgia 30303
rkstarkey@ureach.com

This 18th day of August, 2011.

**FREEMAN MATHIS & GARY, LLP**

*/s/ Brian R. Dempsey*
Brian R. Dempsey
Georgia Bar No. 217596
bdempsey@fmglaw.com

661 Forest Parkway
Suite E
Forest Park, Georgia 30297
(404) 366-1000 (telephone)
(404) 361-3223 (facsimile)

**L:\DOCS\3000\00379\00045713.DOC**